# Exhibit 1

Page 1

```
                         MISSOURI CIRCUIT COURT
                     TWENTY-SECOND JUDICIAL CIRCUIT
                            CITY OF ST. LOUIS

   MARGO GILL, ON BEHALF OF        )
   HERSELF AND HER MINOR           )
   CHILD, R.D.,                    )    Cause No.
                                   )    2322-CC01251
                 Plaintiff,        )
                                   )    Div. 22
        -vs-                       )
                                   )
   ABBOTT LABORATORIES, et al.,    )
                                   )
                 Defendants.       )
```

The videotaped deposition of MILES WHITE, called by the Plaintiff for examination, taken before CORINNE T. MARUT, C.S.R. No. 84-1968, Registered Professional Reporter and a Certified Shorthand Reporter of the State of Illinois, at the offices of Kirkland & Ellis LLP, Suite 5200, 333 West Wolf Point Plaza, Chicago, Illinois, on June 19, 2024, commencing at 10:05 a.m.

Page 2

```
 1  APPEARANCES:
 2     JUDGE NORTON, Special Master (via Zoom)
 3
 4  ON BEHALF OF THE PLAINTIFF:
 5     TORHOERMAN LAW LLC
        210 South Main Street
 6      Edwardsville, Illinois  62025
        618-656-4400
 7      BY:  TOR HOERMAN, ESQ.
             tor@thlawyer.com
 8           ERIC CRACKEN, ESQ.
             ecracken@thlawyer.com
 9           CHAD FINLEY, ESQ. (via Zoom)
             cfinley@thlawyer.com
10           TYLER J. SCHNEIDER, ESQ. (via Zoom)
             tyler@thlawyer.com
11
              -and-
12
        STRANCH, JENNINGS & GARVEY, PLLC
13      701 Market Street, Suite 1510
        St. Louis, Missouri  63101
14      314-390-6750
        BY:  ELLEN THOMAS, ESQ. (via Zoom)
15           ethomas@stranchlaw.com
16            -and-
17      STRANCH, JENNINGS & GARVEY, PLLC
        223 Rosa L. Parks Avenue, Suite 200
18      Nashville, Tennessee 37203
        615-254-8801
19      BY:  CALEB HARBISON, ESQ.  (via Zoom)
             charbison@stranchlaw.com
20
21
22
23
24
```

Page 3

```
 1  APPEARANCES (Continued):
 2  ON BEHALF OF THE DEFENDANTS and THE DEPONENT:
 3     KIRKLAND & ELLIS LLP
        333 West Wolf Point Plaza
 4      Chicago, Illinois  60654
        312-862-2000
 5      BY:  JAMES F. HURST, ESQ.
             james.hurst@kirkland.com
 6
              -and-
 7
        JONES DAY
 8      110 North Wacker Drive, Suite 4800
        Chicago, Illinois 60606
 9      312-782-3939
        BY:  KRISTINA K. CERCONE, ESQ.
10           kcercone@jonesday.com
11            -and-
12      WINSTON & STRAWN LLP
        2121 North Pearl Street, Suite 900
13      Dallas, Texas  75201
        214-453-6500
14      BY:  AARON C. O'DELL, ESQ. (via Zoom)
             acodell@winston.com
15
16
17  ALSO PRESENT:
18     JIM LOPEZ, Exhibit Technician
19
20  VIDEOTAPED BY:  BEN STANSON
21
22  REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
23
24
```

Page 4

```
 1                     I N D E X
 2  MILES WHITE                 EXAMINATION
 3    BY MR. HOERMAN................   7
      BY MR. HURST..................  210
 4    BY MR. HOERMAN................  230
 5
 6
                      E X H I B I T S
 7
    PLAINTIFF EXHIBIT              MARKED FOR ID
 8
    Exhibit 1     Demonstrative exhibit      59
 9
    Exhibit 2     Demonstrative exhibit     122
10
    Exhibit 3     Demonstrative exhibit     129
11
    Exhibit 4     1/24/14 e-mail string;    143
12                ABT_Jupiter05772495
13  Exhibit 5     Demonstrative exhibit     153
14  Exhibit 6     Handwritten document      159
                  dated 4/26
15
    Exhibit 7     Document, handwritten     169
16                notes dated 5/1; Bates
                  Nos. GillProduced_000199
17                - 000202
18  Exhibit 8     Document,                 191
                  "Pharmacoeconomic Model";
19                Bates Nos.
                  ABT_Jupiter01733378 -
20                01733390
21
22
23
24
```

Page 5

```
 1          EXHIBIT INDEX (Continued)
 2  DEFENDANT EXHIBIT              MARKED FOR ID
 3  Exhibit 9     Demonstrative exhibit     212
 4  Exhibit 10    Demonstrative exhibit     214
 5  Exhibit 11    1/14/14 e-mail with       222
                  attachment;
 6                Bates Nos. 01966591
 7
 8
 ...
24
```

Page 138

1 the claimed benefits were of Prolacta with respect
2 to NEC?
3    A.   It wasn't relevant, and I'll tell you
4 why.
5    Q.   I didn't ask you.
6    A.   The benefits -- the same --
7    Q.   I'm just asking you whether you knew or
8 not.  Your lawyer can ask you about the relevance
9 of it.
10        I'm asking you, you did not understand
11 the benefits with respect to NEC that were being
12 touted by your sales force?
13    A.   I did understand.
14    Q.   You did?
15    A.   I did.
16    Q.   You understood it was 77%?
17    A.   I didn't know 77%.  But I understand
18 that generally the positioning was human milk
19 product, lower incidence rate, improved incidence
20 rate, versus formula.
21    Q.   Perfect.  I appreciate that.
22        You did understand that when you made
23 the decision?
24    A.   Yes.

Page 139

1    Q.   Okay.  That this product that you were
2 choosing not to buy could decrease the amount of
3 kids that get this horrible disease.  You
4 understood that?
5    A.   It already was.
6    Q.   Understood.  And you understood that
7 when you made that decision?
8    A.   Abbott didn't have to own it.
9    Q.   I got it.  I got it.  But if you did,
10 you would have tried to scale it, right?
11    A.   My assessment was it could not be scaled
12 for the following reason:  The numbers of mothers,
13 lactating mothers, that it would take to serve a
14 greater market was so great as to not be feasible
15 to do for the following reason.
16        The suggestion was we were going to go
17 pay mothers to provide that milk as the supply.
18 Whenever we've -- we or others in the industry have
19 had to go out to purchase or collect, let's take
20 plasma as an example, the plasma industry, that
21 puts the burden heavily on people from a low
22 socioeconomic background.
23        So, imagine that you have to go out and
24 find an enormous quantum leap in the numbers of

Page 140

1 lactating mothers, persuade them by paying them to
2 give their milk, which could go to their own
3 babies, to give their milk to a company to create a
4 product that you can't scale because you can't get
5 that many without impacting their own babies and
6 without impacting lower socioeconomic populations,
7 that's not scaleable.
8        And I bet you if you go look, Prolacta
9 isn't producing or selling any more today than they
10 were ten years ago.
11    Q.   They don't have Abbott behind them
12 either, do they?
13    A.   They don't need Abbott behind them.  If
14 the argument is so compelling, and I think there is
15 a compelling argument for human milk --
16    Q.   Fortifier.
17    A.   Well, fortifier or human milk to treat
18 babies.  Whether -- well, I guess it is donated
19 milk in any case.
20        There is a compelling medical answer
21 there.  If that's the case, that didn't depend on
22 Abbott.
23    Q.   Why not?  It could have.  If you bought
24 the company, you would have a bunch of effort

Page 141

1 behind it, wouldn't you?
2    A.   I don't think it could be done, and I
3 don't think that the -- what would I call it?  I'm
4 not sure that you can make an ethical argument for
5 trying to pay mothers --
6    Q.   So, was it ethics?
7    A.   -- to donate their milk.
8    Q.   Fair enough.  Was it ethics that --
9    A.   I think it's a combination of factors,
10 but the first one was the notion of trying to scale
11 this to the number of lactating mothers that you
12 would need to collect.
13        Look, there is organizations that
14 collect donated milk as it is.  They can't find
15 enough people to create more donated milk, and you
16 can't do it without impacting the babies that are
17 served by those mothers.
18        So, I didn't believe that that was a
19 workable or even valid business argument.  And you
20 were going to have to go pay for the unit at more
21 than what I believe they put in their presentation
22 to me.  I didn't buy their business model at all.
23    Q.   Okay.  Fair enough.  So, but for four
24 years --

Page 222

1  there? Actually, I'll do that anyway. So, should
2  we blow it up?
3       So, actually -- this is my copy. It
4  doesn't matter, right? All right.
5       (WHEREUPON, Exhibit 11 was marked
6        for identification: 1/14/14 e-mail
7        with attachment; Bates Nos.
8        01966591.)
9  BY MR. HURST:
10  Q.  Mr. White, you see the date there, it's
11 January 14, 2014?
12  A.  Yes.
13  Q.  All right. And you see at the bottom,
14 second paragraph from the bottom, it says, "The
15 purpose of this meeting is to walk through flow of
16 the Prolacta deck that we'll send to Rhonda by end
17 of day supporting JCL/KCD discussion with MDW next
18 Monday."
19      Do you see that?
20  A.  Yes.
21  Q.  Who is MDW?
22  A.  That would be me.
23  Q.  Okay. All right. If you go to the
24 first page, it says, "Project Goodwill, Donor Milk

Page 223

1  2013."
2       Do you see that?
3  A.  Yes.
4  Q.  What's that refer to?
5  A.  I can only assume it refers -- it refers
6  to Prolacta.
7  Q.  Yeah. And you'll see "Agenda. Review
8  strategic value for Abbott entering the donor milk
9  market."
10      Do you see that?
11  A.  Yeah.
12  Q.  Okay. I just really just want to ask
13 you about one portion of this, this deck. And if
14 you go to -- it's page 14. It's really tiny print.
15 You can probably --
16  A.  On the -- okay.
17  Q.  Oh, it's the tab. We put a tab there
18 for you.
19  A.  Got it.
20  Q.  It says at the top "Donor Milk Financial
21 Estimates."
22      Do you see that?
23  A.  Yes.
24  Q.  Okay. And there is a column that says

Page 224

1  "2014"?
2  A.  Yes.
3  Q.  And it says, "Supply, 774." Do you see
4  that?
5  A.  Yes.
6  Q.  Now, if you go all the way out to 2023,
7  it says, "Supply, 3,815."
8       Do you see that?
9  A.  Yes.
10  Q.  What kind of an increase in supply is
11 your team making as they're recommending or --
12 recommending that we consider, that Abbott consider
13 buying Prolacta?
14  A.  Well, the math alone says about five
15 times over a ten-year period.
16  Q.  Okay. Now, I'm going to ask you two
17 kinds of questions. One is do you think that was
18 executable, and then two is did you have any
19 problems with their plan to try to execute it.
20      So, what did you think? Was that
21 executable?
22  A.  I did not think that was executable.
23  Q.  Why?
24  A.  Because if you're going to go out, which

Page 225

1  this presumes, and pay for mothers to donate their
2  own breast milk, you're going to have to find an
3  awful lot of donor mothers and you're going to find
4  that you are over-relying on lower socioeconomic
5  demographics because you're incenting them with
6  money and they're going to have to make a decision
7  about diverting their own breast milk to this
8  purpose.
9       And, in addition, because of that lower
10 economic status, you're going to have to recruit
11 far more volume than this even projects because
12 just through the diagnostic testing and so forth of
13 the product you're going to have to do, you're
14 going to reject an awful lot of that source.
15  Q.  So, what do you mean "diagnostic
16 testing"?
17  A.  Testing for drug use, testing for
18 hepatitis. You'd have to do the same thing with
19 this that you do with blood units when people
20 donate blood.
21  Q.  ==Okay. And did you have any concerns==
22 ==with mothers diverting their lactated milk to==
23 ==selling it to Abbott Laboratories as opposed to==
24 ==giving it to their own infants?==

57 (Pages 222 - 225)

Page 226

1  A.  Yes.  And beyond that, if you're going
2  to go pay for units, you're probably going to
3  threaten the supply that comes from not-for-profit
4  donor organizations.  So, you're going to disrupt
5  what already exists in trying to pay for supply and
6  trying to create the supply, which I think begins
7  to tread into areas where I think the ethics can be
8  challenged on that.
9  Q.  Okay.
10  A.  I just didn't think it was executable.
11  Q.  Okay.  Did Abbott want to be -- as the
12  CEO, was -- were you comfortable with Abbott
13  getting into the business of trying to buy donor
14  milk from mothers and particularly if you would
15  have had to target those in the lower socioeconomic
16  strata of our society?
17  A.  No.  And, you know, I had seen similar
18  models in the plasma industry, et cetera, that
19  would validate my concern and assumptions because
20  one of the first areas I was involved in when I
21  joined Abbott was blood screening and plasma
22  screening.  And that's how the plasma market works.
23  And, so, you know, I have that experience.  I've
24  seen that, but the people in nutrition have not.

Page 227

1  Q.  Okay.
2  A.  They've only been in that business.  So,
3  I don't think they would have considered that
4  particular dimension of this.
5      And to me, this was not going to be,
6  first of all, executable.  Secondly, the way in
7  which it had to be executed to try to reach volume
8  targets like this, I just didn't think was going to
9  fly.
10  Q.  All right.
11  MR. HOERMAN:  I don't mean to interrupt your
12  flow.  But this document, has this been produced to
13  us?
14  MS. CERCONE:  Yes, it has.
15  MR. HOERMAN:  I didn't see the Bates.  There
16  is no Bates on it.
17  MS. CERCONE:  Oh, then it got cut off.  It's
18  01966591.
19  BY MR. HURST:
20  Q.  Mr. White, you mentioned the plasma
21  business.  Has Abbott ever been in the business of
22  buying plasma from donors itself?  Has Abbott ever
23  been in that business?
24  A.  It's possible, but I'm not sure.

Page 228

1  Q.  All right.
2  A.  Maybe for research purposes.
3  Q.  Okay.  But what was your exposure to the
4  plasma business that helped to guide your thinking
5  on this idea of trying to --
6  A.  The plasma -- sorry.
7  Q.  -- trying to buy human milk from
8  mothers?
9  A.  My familiarity with the plasma business
10  was because they were a big customer of diagnostic
11  testing to screen donated plasma or blood units.
12  Q.  Okay.  Another question.
13  MR. HURST:  Can you help me?  Thank you.
14  BY MR. HURST:
15  Q.  Mr. Hoerman showed you this document
16  where it says at the bottom "Meaningless
17  Distraction."
18      Do you see that?
19  A.  Yes.
20  Q.  And you saw those two words used in an
21  e-mail between you and Mr. Freyman surrounding this
22  Prolacta decision?
23  A.  Um-hmm.
24  Q.  Okay.  What did you mean by that?

Page 229

1  A.  That was a reference solely to my belief
2  that as an acquisition, because the business
3  couldn't be scaled and because it had the issues
4  that I just described, spending time on due
5  diligence to try to pursue it was a waste of our
6  time because just because somebody had an idea, it
7  doesn't make it one that can be executed.  I didn't
8  think it could be.  So, I thought it was a
9  distraction to pursue it or even to lead Prolacta
10  along because it wasn't going to be doable.
11  Q.  And, in fact, Prolacta was doing this
12  whether or not Abbott purchased the company?
13  A.  Prolacta was already in business and we
14  had been their co-marketing partner, which gave
15  them access to all the NICUs and so forth through
16  us, which was a good thing.
17      But we learned a lot over those three,
18  four years that validate to me that you could not
19  have expanded the supply of this enough.  And I
20  believe that's still true to this day.
21  Q.  Did any other company buy Prolacta after
22  Abbott turned it down?
23  A.  Not to my knowledge.
24  Q.  In your time as CEO, did you see any